**23-6094(Con.), 23-6238(Con.)**
*United States of America v. Constantinescu*

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED  8/14/2025

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

—————————

August Term, 2024

Argued: December 2, 2024    Decided: August 14, 2025

Docket Nos. 23-6094(Con.), 23-6238(Con.)

—————————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MIRCEA CONSTANTINESCU, NIKOLAOS LIMBERATOS,

*Defendants-Appellants,*

CRISTIAN COSTEA, IONELA CONSTANTINESCU, THEOFRASTOS LYMBERATOS, ANDREW ELIOPOULOS, VALENTIN PETRESCU, PETER SAMOLIS, KELLY KARKI LAM, GEORGE SERBAN, DRAGOS DIACONU, MADLIN ALEXANDRU ANCA, CHRISTIAN ULMANU, IULIANA MIHAILESCU, FLORIAN CLAUDIU MARTIN, ALEX DONATI, RAUL IONUT VIDRASAN, NICOLAE DANIEL PEPY, ALEXANDRU IORDACHE, ROBERT DUCZON, DAN MIRICA, CLAUDIU COSTINEL MIHAI, DAVID GEORGESCU, ANDREI RAZVAN RUSU, CLAUDIU VADUVA, GABRIEL ORZANICA, GEORGE CACERAS ORTMEIER, DANIEL SILVU CAMARAS, ALIN HANES CALUGARU, ALEXANDRU RADULESCU,

*Defendants.*[*]

—————————

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the caption above. Although Defendant Alexandru Radulescu

CERTIFIED COPY ISSUED ON 08/14/2025

---

B e f o r e:

LYNCH, LEE, and PÉREZ, *Circuit Judges*.

---

Defendants-appellants Mircea Constantinescu and Nikolaos Limberatos ("Defendants") were convicted of conspiracy to commit access device fraud, conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and aggravated identity theft. Constantinescu and Limberatos were then sentenced to 92-months' and 120-months' imprisonment respectively and ordered to pay millions of dollars in restitution. On appeal, Defendants jointly challenge their aggravated identity theft convictions; and individually, Constantinescu challenges the substantive reasonableness of his sentence and the installment payments he must make toward his restitution obligation during his term of incarceration, while Limberatos challenges the denial of his motion to suppress evidence seized from his garage and the procedural reasonableness of his sentence. For the reasons discussed below, we AFFIRM Defendants' prison sentences and convictions but VACATE Constantinescu's restitution order and REMAND for clarification of Constantinescu's installment payment schedule.

---

B. ALAN SEIDLER, B. Alan Seidler, Esq., New York, NY, *for* Defendant-Appellant Nikolaos Limberatos.

DEVIN MCLAUGHLIN, Langrock Sperry & Wool, LLP, Middlebury, VT *for* Defendant-Appellant Mircea Constantinescu.

SAMUEL P. ROTHSCHILD (Elizabeth A. Hanft, Maggie Lynaugh, Danielle R. Sassoon, *on the brief*), Assistant United States Attorneys, *for*

---

was originally a party to this consolidated case, he withdrew his appeal after briefing was completed.

2

Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for* Appellee the United States of America.

---

GERARD E. LYNCH, *Circuit Judge*:

Defendants-Appellants Mircea Constantinescu and Nikolaos Limberatos ("Defendants") appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York (Sidney H. Stein, *J.*) for conspiracy to commit access device fraud, conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and aggravated identity theft. The district court sentenced Constantinescu and Limberatos to imprisonment for 92 months and 120 months respectively and required them to pay millions of dollars in restitution in installment payments, with the option to do so through the Bureau of Prisons' Inmate Financial Responsibility Plan ("IFRP") during the term of their incarceration.

On appeal, Defendants jointly challenge their convictions for aggravated identity theft on the ground that the debit card and personal identification numbers that they stole from individual victims are not "means of identification" under 18 U.S.C. § 1028A. Separately, Limberatos argues that the district court

3

erroneously denied his motion to suppress evidence seized from his garage and that the district court procedurally erred in calculating his Guidelines range, while Constantinescu contends that his sentence is substantively unreasonable and that his restitution order impermissibly delegates the district court's authority to set an installment payment schedule to the Bureau of Prisons.

For the reasons discussed below, we VACATE the restitution order imposed on Constantinescu and REMAND for clarification of his installment payment obligations while incarcerated, but otherwise AFFIRM Defendants' convictions and sentences in full.

## BACKGROUND

On September 19, 2019, Constantinescu and Limberatos were charged with conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2), conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349, conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and aggravated identity theft, in violation of 18 U.S.C. §§ 2, 1028A(a)(1), (b). The charges stem from Defendants' involvement in a large-scale ATM skimming operation, which spanned across the United States, Europe, and Mexico, that resulted in millions of dollars of losses to financial institutions and individual

account holders.

Described generally, each skimming job proceeded in four steps. First, members of the conspiracy installed skimming devices and hidden cameras on ATMs or other point-of-sale devices, which secretly recorded the debit card numbers and personal identification numbers ("PINs") of customers that used the machines. Second, they used the stolen debit card numbers to create counterfeit debit cards and then reviewed the video footage from the hidden cameras to match the debit cards with the associated PINs. Third, they used the counterfeit cards and PINs to withdraw cash from individual victims' bank accounts without authorization. Fourth and finally, they laundered the cash overseas to conceal the illicit origins of the proceeds.

Defendants each played key, yet distinct, roles in the conspiracy. Constantinescu, for his part, did not directly partake in installing skimming devices on ATMs or in cashing out fraudulent debit cards. Instead, he was mainly involved at the front end and the back end of the operation: he sent and received packages from his co-conspirators containing skimming devices and laundered the illicit proceeds of the operation to Romania through couriers and packages.

5

Limberatos, in contrast, was more involved in the on-the-ground operations. He built and tested skimming devices, found locations to skim, created counterfeit debit cards and distributed them to conspiracy members, supervised cash outs, and communicated PINs over the phone to the conspiracy members who were physically at the ATM cashing out the counterfeit cards. Limberatos was so deeply enmeshed in the on-the-ground operation of the conspiracy that in October of 2019, when he was arrested, officers found skimming devices, component parts used to build skimming devices, and counterfeit debit cards in his garage.[1]

Limberatos and Constantinescu were jointly tried at a jury trial that commenced on June 28, 2022. Constantinescu went to trial on all four counts against him, while Limberatos went to trial only on the aggravated identity theft count, having pled guilty to the other three counts against him a few days before trial. Ultimately, the jury convicted Limberatos of aggravated identity theft and convicted Constantinescu of conspiracy to commit access device fraud,

---

[1] Limberatos moved to suppress the evidence recovered from his garage, but the district court denied the motion because the search of the garage was authorized as a protective sweep incident to a lawful arrest. We discuss and affirm that ruling below.

conspiracy to commit wire fraud and bank fraud, conspiracy to commit money laundering, and aggravated identity theft.

The district court sentenced both Defendants to below-Guidelines sentences. Limberatos was sentenced to 120 months' imprisonment, and Constantinescu to 92 months' imprisonment. The district court also imposed restitution on both Limberatos and Constantinescu, in the amount of $8,787,345.50 and $1,953,220.20, respectively, and required them to make installment payments toward that obligation while incarcerated, with the option of doing so through the Bureau of Prisons' IFRP.

## DISCUSSION

On appeal, Defendants raise only one challenge to their convictions. They contend that their convictions for aggravated identity theft should be vacated because the debit card numbers and PINs that they stole are not "means of identification" under the aggravated identity theft statute, 18 U.S.C. § 1028A. Separately, Limberatos contends that evidence recovered from his garage should have been suppressed because exigent circumstances did not justify the search of the garage; he also raises a number of procedural challenges to his 120-month sentence. For his part, Constantinescu argues that his 92-month sentence is

7

substantively unreasonable because of a disparity between his sentence and that of his wife, co-defendant Ionela Constantinescu; he also challenges the installment payment schedule set in his restitution order. For the reasons discussed below, we reject Defendants' challenges to their convictions and prison sentences but vacate and remand the restitution order imposed on Constantinescu for the district court to clarify the installment payment schedule that applies while Constantinescu is incarcerated.

## I.   Aggravated Identity Theft Convictions

We begin with Defendants' challenge to their convictions for aggravated identity theft. As relevant here, Defendants are guilty of aggravated identity theft if "during and in relation to" the conspiracy to commit access device fraud and/or the conspiracy to commit wire fraud and bank fraud, they "knowingly transfer[red], possesse[d], or use[d], without lawful authority, a *means of identification* of another person." 18 U.S.C. § 1028A(a)(1), (c)(4)–(5) (emphasis added). As they did below in their Rule 29 motions, Defendants contend on appeal that they are not guilty of aggravated identity theft because the debit card numbers and PINs that they stole are not "means of identification" under 18 U.S.C. § 1028A. That argument is without merit.

8

On appeal, we assess whether debit card numbers and PINs are means of

identification within the meaning of the aggravated identity theft statute *de novo*.

*United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009). In undertaking that

analysis, we start where we always do, with the text of the statute, and because

the plain meaning of that text unambiguously resolves this issue against

Defendants, our analysis also ends with that text. *See Wilson v. United States*, 6

F.4th 432, 435 (2d Cir. 2021) ("In interpreting any statute, we start with the plain

meaning of the text, and absent any ambiguity, we end there too.").

By statute, "means of identification" are defined as

> any name or number that may be used, alone or in
> conjunction with any other information, to identify a
> specific individual, including any–
>> (A) name, social security number, date of birth,
>> official State or government issued driver's
>> license or identification number, alien registration
>> number, government passport number, employer
>> or taxpayer identification number;
>> (B) unique biometric data, such as fingerprint,
>> voice print, retina or iris image, or other unique
>> physical representation;
>> (C) unique electronic identification number,
>> address, or routing code; or
>> (D) telecommunication identifying information or
>> *access device* (as defined in section 1029(e)).

18 U.S.C. § 1028(d)(7) (emphasis added). In turn, "access device" is defined in

9

Section 1029(e) as

> any card, plate, code, account number, electronic serial
> number, mobile identification number, *personal
> identification number*, or other telecommunications
> service, equipment, or instrument identifier, *or other
> means of account access that can be used, alone or in
> conjunction with another access device, to obtain money,
> goods, services, or any other thing of value, or that can be
> used to initiate a transfer of funds* (other than a transfer
> originated solely by paper instrument).

*Id.* § 1029(e)(1) (emphases added). Here, both PINs and debit card numbers are

"access devices" and thus are "means of identification" within the meaning of the

aggravated identity theft statute. *See id.* § 1028(d)(7)(D).

A PIN, short for a personal identification number, is *expressly* included in

the definition of "access device." *Id.* § 1029(e)(1). And even though debit card

numbers are not explicitly included in the definition of an "access device," they

do fall within the catch-all provision that covers "other means of account access

that can be used, alone or in conjunction with another access device, to obtain

money." *See id.* That is because Defendants used the debit card numbers to create

counterfeit debit cards, which in conjunction with the PINs (*i.e.*, an access device),

were then inserted into ATMs and other point-of-sale devices to access the

individual victims' bank accounts and withdraw money. *See, e.g., United States v.*

10

*Delgado*, 124 F. App'x 694, 695–96 (2d Cir. 2005) (concluding that the defendant

"trafficked in unauthorized access devices," in violation of 18 U.S.C. § 1029(a)(2),

"when he gave six credit card numbers to [an] undercover agent in exchange for

cash").[2] Accordingly, it directly follows that PINs and debit card numbers, as

access devices, are "means of identification" within the meaning of the

aggravated identity theft statute. *See* 18 U.S.C. § 1028(d)(7)(D).

We therefore affirm Defendants' convictions for aggravated identity theft.

## II.   Search of Limberatos's Garage

Because we discern no legal infirmity in Limberatos's conviction for

aggravated identity theft, we now turn to his challenge to the district court's

denial of his motion to suppress evidence that was seized from his garage after

he was arrested at his residence on the morning of October 10, 2019 pursuant to a

lawfully obtained arrest warrant. Before addressing the substance of

_____

[2] Even if debit card numbers were not access devices, a debit card number would still be a "means of identification" because it is a "unique electronic identification number," in that it is an electronically stored number that is linked to and used by banks to identify a specific account holder. 18 U.S.C. § 1028(d)(7)(C); *see, e.g.*, *United States v. Henderson*, 439 F. App'x 56, 60–61 (2d Cir. 2011) (concluding that an "account number" that did not belong to the defendant that was "encoded on [a] counterfeit credit card" is a "means of identification" because it is a "unique electronic identification number"), quoting 18 U.S.C. § 1028(d)(7)(C).

Limberatos's argument on appeal, we provide an overview of the competing accounts of the arrest that the parties presented to the district court.

For his part, Limberatos submitted a written affidavit asserting that after he answered his door that morning, law enforcement officers immediately placed him under arrest and put him into a law enforcement vehicle, which all in all, "took no more than one minute." Supporting Decl. of Nikolaos Limberatos ¶ 2, *United States v. Constantinescu*, No. 19-cr-651 (S.D.N.Y. May 31, 2022), ECF No. 1107. He further contends that, upon his removal from his residence but before the issuance of a search warrant that afternoon, ten to fifteen law enforcement agents searched his home and garage. Limberatos did not testify in person and was not subject to cross-examination.

In contrast, Michael Mulloy, the FBI officer who served as the affiant on the search warrant application to seize the evidence from Limberatos's home, provided a different version of how the arrest unfolded. Mulloy testified that when Limberatos answered the door that morning, he was partially clothed, so officers did not immediately remove him from the residence. Instead, they placed Limberatos under arrest inside the front foyer of his residence, and while Mulloy remained in the foyer with Limberatos, other officers performed a protective

sweep to assess whether there were any individuals in the residence that were a
threat to the officers. During that protective sweep, the officers entered the
garage because the garage was accessible through a door in the kitchen and the
kitchen could be entered from the front foyer without the need to open a door.
Once the officers completed the protective sweep, Mulloy took Limberatos
upstairs to get dressed and then brought him back downstairs.

When Mulloy returned to the downstairs area of the home, an officer who
had performed the protective sweep alerted Mulloy that he had observed
potential evidence during the sweep of the garage. Upon receiving that
information, Mulloy himself went into the garage and saw the following
evidence in plain view: a card encoder, storage devices, a cutting tool, a safe, and
a BMW that Limberatos had been captured on camera using as part of the
skimming operation. Mulloy accordingly alerted the lead investigator on the
case, took photographs of the evidence that was in plain view, and applied for a
search warrant. Once the search warrant was issued that afternoon, the officers
searched Limberatos's home and seized the evidence from the garage.

In the face of these competing accounts, the district court credited Mulloy's
testimony over Limberatos's affidavit. Specifically, the district court found that

Limberatos answered the door partially dressed, and that he was placed under

arrest in the foyer, rather than being immediately removed, to allow him to get

fully dressed before being taken to the FBI office for processing. The district court

also found that while Limberatos was in the foyer, the officers performed a

protective sweep, which could lawfully encompass "all immediately adjoining

areas to the front foyer." Limberatos App'x 134. The district court determined

that the garage was one such "immediately adjoining space" because "the

kitchen [wa]s visible from" and "connected to the front foyer without the need

. . . to pass through a closed door" and "the kitchen had a door that opened into

the garage." *Id.* The district court finally "credit[ed]" Mulloy's testimony that the

officers entered the garage during the protective sweep and then saw the BMW

and other skimming equipment in plain view, which were ultimately seized after

the officers obtained a search warrant that afternoon. *Id.* 135–36.

Accordingly, the district court "conclude[d] that the law enforcement

officers entered the garage as part of a lawfully conducted protective sweep

incident to a lawful arrest." *Id.* 136. And because the search of the garage was

permissible, "Mulloy had a lawful basis upon which to provide the magistrate

with his October 10, 2019 affidavit in support of the search warrant application"

14

and, in turn, the magistrate judge had a valid basis upon which to issue the warrant. *Id.* In sum, the district court held that "the search conducted pursuant to the search warrant did not violate Limberatos's Fourth Amendment right to be free from unreasonable searches and seizures" and Limberatos's suppression motion was accordingly denied. *Id.* 136–37.

On appeal, "we review [the] district court's findings of fact for clear error, and its resolution of questions of law and mixed questions of law and fact *de novo*." *United States v. Haak*, 884 F.3d 400, 408 (2d Cir. 2018). We also "view the evidence in the light most favorable to the government, and we give special deference to findings that are based on determinations of witness credibility." *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017) (alteration adopted) (internal quotation marks and citations omitted).

Before us, Limberatos urges that the district court erred in denying his suppression motion because no exigent circumstances justified the search of his garage. That argument misses the mark. The legality of the search hinges not on whether exigent circumstances existed but on whether the officers were permitted to enter the garage as part of a protective sweep. It is well-established that "[w]hen arresting a person in a residence, officers may perform a protective

sweep incident to the arrest to protect themselves or others." *United States v. Lauter*, 57 F.3d 212, 216 (2d Cir. 1995). The permissible scope of that search, however, is limited. *See United States v. Gandia*, 424 F.3d 255, 261 (2d Cir. 2005) (explaining that the scope of a protective sweep is "narrowly confined") (internal quotation marks omitted). Specifically, officers are permitted, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).

Here, we discern no error in the district court's conclusion that the garage was an immediately adjoining space to the foyer where Limberatos was arrested that could be searched during a protective sweep. The district court was entitled to treat Mulloy's testimony as more credible than Limberatos's affidavit, to find that Limberatos was arrested in the foyer of his home and kept there until the protective sweep was completed. *See United States v. Monzon*, 359 F.3d 110, 119 (2d Cir. 2004) (explaining that a district court's internally consistent decision to credit one witness's testimony over another, when that witness "has told a coherent and facially plausible story that is not contradicted by extrinsic evidence . . . , can virtually never be clear error"), quoting *Anderson v. Bessemer City*, 470

16

U.S. 564, 575 (1985). In addition, the record supports the district court's finding

that the garage was a space immediately adjoining the foyer, as Mulloy testified

that the kitchen and foyer were connected (without a closed door in the way) and

the garage was accessible through a door in the kitchen. *See Lauter*, 57 F.3d at

213–14, 216–17 (finding it proper to sweep a bedroom adjacent to the room where

the defendant was arrested); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 78–79 (2d

Cir. 2018) (finding it proper to sweep a primary bedroom that was adjacent to the

hallway where the defendant was arrested since the hallway and living room

were not divided by a wall and thus the primary bedroom was an immediately

adjacent space to the living room). It therefore follows that the officers were

permitted to search the garage as part of the protective sweep. *See Buie*, 494 U.S.

at 334.

 To the extent that Limberatos argues that Mulloy *himself* entering the

garage *after* the protective sweep was completed constituted an independent

violation of the Fourth Amendment, we disagree.[3] Even if we assume that Mulloy

---

[3] In his brief, Limberatos represents that Mulloy stated in his search warrant affidavit "that he entered the . . . garage after Limberatos was removed from the residence." Limberatos's Br. 14. But the affidavit does not say that; in fact, it says nothing at all about when Mulloy entered the garage. Instead, it was Mulloy's testimony at the suppression hearing that indicated that he entered the garage

should not have entered the garage after the protective sweep, we discern no harm that resulted to Limberatos. That is so because Mulloy's search of the garage mimicked the proper protective sweep that came before it: Mulloy entered the garage only after being alerted by an officer who performed the protective sweep that evidence had been observed in the garage.[4] Mulloy's search thus intruded upon Limberatos's privacy no more than the permissible protective sweep that preceded it, and the officer who performed the protective sweep could have easily substituted for Mulloy and provided the exact same information to the magistrate judge in order to obtain the search warrant. In such circumstances, we conclude that Mulloy's search of the garage was harmless.[5]

---

after the protective sweep was completed. We accordingly address this issue based on Mulloy's in-court testimony rather than based on Mulloy's representations in the affidavit.

[4] Mulloy's actions were analogous to the type of search authorized by the private search doctrine, which "permits government officials, without a warrant, to repeat a search of personal papers and effects already conducted by a private party, so long as the government does not expand upon the prior private search." *United States v. Maher*, 120 F.4th 297, 309 (2d Cir. 2024), citing *United States v. Jacobsen*, 466 U.S. 109, 114–22 (1984).

[5] Even if the material seized from the garage should have been suppressed, any error would still be harmless because "a rational jury would have rendered a verdict of guilty" on the aggravated identity theft count even "absent the alleged error." *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015), quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir. 2001). It is true that the Government

In sum, because the protective sweep of the garage was permissible and

the officers saw evidence of a crime in plain view during that protective sweep,

there was probable cause for the issuance of the search warrant. *United States v.*

*Klump*, 536 F.3d 113, 118 (2d Cir. 2008) ("[A]ny contraband or other evidence of a

crime seen in plain view during . . . a circumscribed search may be used to

establish probable cause to obtain a warrant to conduct a broader search."); *see*

*also United States v. Broward*, 594 F.2d 345, 350 (2d Cir. 1979) (explaining that an

"affidavit in support of [a] search warrant clearly recites probable cause to justify

a search" where "the agent procuring the warrant had observed" evidence of a

crime "all . . . in plain view") (internal quotation marks omitted). Therefore, the

evidence that Limberatos sought to suppress was properly seized pursuant to a

---

offered evidence from the search at trial, because the aggravated identity theft
charge requires proof that Limberatos committed an underlying felony, here,
conspiracy to commit access device fraud or conspiracy to commit wire fraud
and bank fraud. But that evidence was redundant because Limberatos already
admitted guilt to those underlying felonies when he pled guilty, his guilty plea
was admitted at trial, and he explicitly conceded in his opening and closing
arguments that he was guilty of those underlying felonies. The evidence seized
from his garage, while relevant to his admitted guilt on the underlying charges,
had no bearing on whether the conspirators' use of the stolen PIN and debit card
numbers constituted identity theft, the only element of the aggravated identity
theft charge that Limberatos contested at trial. Accordingly, even if the search of
his garage violated Limberatos's Fourth Amendment rights, the admission of the
evidence at trial was harmless.

19

valid search warrant, and we accordingly affirm the district court's denial of

Limberatos's suppression motion.

## III.    Reasonableness of Defendants' Sentences

Having found no legal error in Defendants' convictions, we next address

Defendants' challenges to their sentences. Limberatos raises a plethora of

arguments that the district court procedurally erred in calculating his Guidelines

range, while Constantinescu urges that his sentence is substantively

unreasonable because of an unwarranted disparity between his sentence and the

sentence of his co-defendant wife. For the reasons that follow, we conclude that

Defendants' arguments are without merit.

### A.    Limberatos's Sentence

We start with Limberatos's challenges to the procedural reasonableness of

his sentence. On appeal, Limberatos argues that the district court improperly

applied seven sentencing enhancements, which resulted in a 32-level increase in

the offense level, and erred when it declined to apply a two-level reduction for

acceptance of responsibility. He is wrong.

"A district court commits procedural error where it fails to calculate the

Guidelines range . . . , makes a mistake in its Guidelines calculation, . . . treats the

Guidelines as mandatory[,] . . . does not consider the § 3553(a) factors, or rests its

sentence on a clearly erroneous finding of fact." *United States v. Cavera*, 550 F.3d

180, 190 (2d Cir. 2008) (en banc) (internal citations omitted). In assessing the

procedural reasonableness of the sentence imposed, we "review[] the district

court's interpretation of the Sentencing Guidelines *de novo*" and its factual

findings for clear error. *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005).

Here, we discern no procedural error in the district court's calculation of

Limberatos's Guidelines range.

### 1.  *Loss Amount, Victim, and Gross Receipts Enhancements*

We begin with Limberatos's contention that the district court erred in

finding that (1) the loss amount was between $3.5 million and $9.5 million; (2)

there were more than ten victims; and (3) Limberatos personally derived more

than $1 million in gross receipts from the financial institutions that were targeted.

His challenge to each of these aspects of the district court's Guidelines calculation

boils down to the same factual assertion: that his only relevant conduct was

caught on video and resulted in $944,000 in losses to three financial institutions.

We disagree.

Starting with the district court's loss amount calculation, "[u]nder the

21

Guidelines, the relevant loss amount must be established by a preponderance of the evidence," and "we review such a calculation for clear error." *United States v. Moseley*, 980 F.3d 9, 29 (2d Cir. 2020). In calculating the loss amount, the district court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information." *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (internal quotation marks omitted). In addition, the district court's calculation should include not only those losses that the defendant personally caused but also any "reasonably foreseeable pecuniary harm that resulted from the offense." U.S. SENT'G GUIDELINES MANUAL § 2B1.1 app. note 3(A) (U.S. SENT'G COMM'N 2021).

Here, the district court determined that the loss amount that was reasonably foreseeable to Limberatos was between $3.5 million and $9.5 million, which resulted in an 18-level increase to Limberatos's offense level. That calculation was not clearly erroneous, as the trial evidence substantiated the district court's calculation.

Specifically, the testimony at trial established that Limberatos participated in more than just the offenses he was caught on camera committing: he was involved in more than a dozen skimming jobs with his co-conspirator and

partner Constantin Ovidiu Tita and in about a dozen skimming jobs with his co-conspirator and co-defendant Alexandru Radulescu. And Tita testified that his skimming group, which included Limberatos, alone earned two to four million dollars. Given Limberatos's extensive involvement with Tita, the two to four million dollars in losses that stemmed from Tita's group were reasonably foreseeable to Limberatos, and there were additional losses that were reasonably foreseeable to Limberatos based on his separate involvement with Radulescu. Since "the actual loss" under the Guidelines that Limberatos is responsible for "is the reasonably foreseeable pecuniary harm that resulted from the offense," *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010) (internal quotation marks omitted), the district court fairly inferred from the trial evidence that "a reasonable estimate of the loss" amount exceeded $3.5 million but was less than $9.5 million, Limberatos App'x 85.

Similarly, the trial evidence defeats Limberatos's argument that his criminal conduct affected only three victims. Under the Guidelines, a two-level enhancement applies "[i]f the offense . . . involved 10 or more victims," U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(2)(A)(i). In turn, a "victim" is defined, in relevant part, as "any person who sustained any part of the actual loss" that the

23

defendant is responsible for under the loss amount calculation, *id.* § 2B1.1 app.

note 1; *see also United States v. Lacey*, 699 F.3d 710, 715 (2d Cir. 2012), or "any

individual whose means of identification was used unlawfully or without

authority," U.S. SENT'G GUIDELINES MANUAL § 2B1.1 app. note 4(E); *see also United*

*States v. Jesurum*, 819 F.3d 667, 671 (2d Cir. 2016).

Here, the district court relied on the financial institutions that suffered

financial losses, rather than the individual account holders whose means of

identification were stolen, to calculate the number of victims. But the record

makes it difficult to discern which financial institutions were included in the

district court's loss amount calculation. By contrast, it is much clearer that there

were more than ten individual victims whose means of identification, *i.e.*, debit

card numbers and PINs, were stolen. *See* U.S. SENT'G GUIDELINES MANUAL § 2B1.1

app. note 1 (defining "means of identification"). That is because a cooperating

witness testified that Limberatos gave her counterfeit debit cards to cash out on

many occasions, and Tita testified that each skimming job typically entailed

cashing out multiple such counterfeit cards. Given that Limberatos personally

participated in dozens of skimming jobs, we discern no clear error in the district

court's conclusion that there were at least ten victims.

Limberatos's challenge to the district court's finding that he derived $1,000,000 in gross receipts fails on similar grounds. Under the Guidelines, a two-level enhancement applies if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(17)(A). Unlike the loss amount, which holds a defendant accountable for all reasonably foreseeable losses, the gross-receipts enhancement applies only "if the gross receipts to the defendant *individually*, rather than to all participants, exceeded $1,000,000." *Id.* § 2B1.1 app. note 13(A) (emphasis added). The trial testimony established that Limberatos and Tita split the proceeds of their joint operations 50-50, after giving a 20% cut to the individuals that completed the on-the-ground skimming, and that Elena Moldovan, one such lower-level member of the skimming operation that cashed out cards for Limberatos and Tita (among other members of the conspiracy), made $1 million just from her 20% cut of the proceeds. The district court thus reasonably concluded that Limberatos must have profited at least $1 million, if a lower-level member of the conspiracy made that much from a smaller cut of the proceeds.

In sum, the district court did not procedurally err in applying an 18-level

25

enhancement for the loss amount, a two-level enhancement because the offense affected more than ten victims, and a two-level enhancement because Limberatos personally derived more than $1,000,000 in gross receipts from the offense.

### 2. *Sophisticated Means Enhancement*

We next address Limberatos's argument that the district court erred in applying a two-level enhancement for Limberatos's intentional use of sophisticated means to commit his crimes, *see* U.S. SENT'G GUIDELINES MANUAL § 2B1.1(b)(10)(C), because the skimming equipment he built was available for purchase online and simple to use. We are not persuaded.

The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.* § 2B1.1 app. note 9(B). The testimony at trial established that to carry out the offense conduct, many different kinds of skimming device were built and installed, as the devices had to be customized to fit each type of ATM that was targeted, and the trial testimony, coupled with physical evidence recovered from Limberatos's garage, showed that Limberatos built those complex skimming devices. The trial evidence therefore supported the district court's application of the sophisticated means enhancement. *See United States v.*

*Muresanu*, 951 F.3d 833, 840 (7th Cir. 2020) (affirming the application of the

sophisticated means enhancement when "[t]he scheme involved sophisticated

equipment—ATM skimmers and pinhole cameras—and installing these devices

without being detected").

### 3. *Device-Making Equipment Enhancement*

Limberatos next argues that the district court's application of the two-level

enhancement for "the possession . . . of . . . device-making equipment" and "the

production or trafficking of an[] . . . unauthorized access device," U.S. SENT'G

GUIDELINES MANUAL § 2B1.1(b)(11), constituted impermissible double counting

because his conviction for conspiracy to commit access device fraud was already

accounted for in the base offense level. That is incorrect.

"Impermissible double counting occurs when one part of the [G]uidelines

is applied to increase a defendant's sentence to reflect the kind of harm that has

already been fully accounted for by another part of the [G]uidelines." *United

States v. Watkins*, 667 F.3d 254, 261 (2d Cir. 2012), quoting *United States v. Volpe*,

224 F.3d 72, 76 (2d Cir. 2000). In contrast, it is not double counting "when the

challenged part of the Guidelines aims at different harms emanating from the

same conduct" or "reflect[s] different facets of the defendant's conduct." *Id.* at

261–62 (alteration adopted) (internal quotation marks omitted). The enhancement at issue here falls into the latter category because the base offense level under the Guidelines did not account for the fact that Limberatos possessed device-making equipment and built unauthorized access devices.

Here, Limberatos's convictions for conspiracy to commit access device fraud, conspiracy to commit wire fraud and bank fraud, and conspiracy to commit money laundering were grouped together for purposes of calculating the Guidelines range, and the base offense level for this grouping was set at seven under Section 2B1.1(a)(1) of the Guidelines. Critically for our purposes, Section 2B1.1 "appl[ies] to offenses prosecuted under a wide variety of federal statutes," U.S. SENT'G GUIDELINES MANUAL § 2B1.1, introductory cmt., so the base offense level was calculated solely based on the fact that Limberatos "was convicted of an offense referenced in [Section 2B1.1]; and . . . that offense of conviction has a statutory maximum term of imprisonment of 20 years or more." *Id.* § 2B1.1(a)(1). That means that the base offense level did *not* account for Limberatos's possession of device-making equipment or his production of unauthorized access devices. Thus, when the enhancement under Section 2B1.1(b)(11), which did account for that conduct, was applied, there was no impermissible double

counting. *See United States v. Reingold*, 731 F.3d 204, 228 (2d Cir. 2013) (finding the application of a two-level enhancement for distribution under Section 2G2.2(b)(3)(F) of the Guidelines did not result in impermissible double counting when the base offense level under Section 2G2.2 of the Guidelines "applies equally to a variety of offenses, some involving distribution and others not").

We accordingly discern no error in the district court's application of the enhancement under Section 2B1.1(b)(11).

### 4.    *Money Laundering Conspiracy Enhancement*

We next turn to the district court's inclusion of the two-level enhancement under Section 2S1.1(b)(2)(B), which applies to defendants, like Limberatos, who are "convicted under 18 U.S.C. § 1956" of money laundering offenses. U.S. SENT'G GUIDELINES MANUAL § 2S1.1(b)(2)(B). Although the enhancement is facially applicable, Limberatos urges that he falls into the exception in the Guidelines that provides the enhancement under Section 2S1.1(b)(2)(B) should not be applied when "the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957." *Id.* § 2S1.1 app. note 3(C). He is wrong.

Here, violation of 18 U.S.C. § 1957 was not the sole object of the money laundering conspiracy that Limberatos pled guilty to. Rather, Limberatos pled guilty to a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), that was specified in the indictment to have *three* objects: two of which violated Section 1956(a) and only the third of which violated Section 1957(a). We accordingly discern no error in the district court's application of the two-level enhancement under Section 2S1.1(b)(2)(B). *See United States v. Torres-Velazquez*, 480 F.3d 100, 104 (1st Cir. 2007) (affirming the district court's application of the enhancement under Section 2S1.1(b)(2)(B) when the defendant pled guilty to a money laundering conspiracy that was specified in the indictment to have had the object of violating 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(1)(B)(i)).

### 5.    *Leadership Enhancement*

Limberatos's penultimate argument is that the district court erred in finding that the four-level enhancement under Section 3B1.1(a) of the Guidelines was warranted because Limberatos "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sent'g Guidelines Manual § 3B1.1(a). He urges that this enhancement is inapplicable because there is no evidence that he "plan[ned] or organize[d] . . .

30

skimming jobs" or that he had "decision making authority."[6] Limberatos Br. 31.

We once again disagree.

Whether the defendant is "a leader depends upon the degree of discretion

exercised by him, the nature and degree of his participation in planning or

organizing the offense, and the degree of control and authority exercised over the

other members of the conspiracy." *United States v. Paccione*, 202 F.3d 622, 624 (2d

Cir. 2000), quoting *United States v. Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992).

Here, there is no question that Limberatos was a leader or organizer of the

skimming operation. As the district court appropriately found based on the

evidence at trial, Limberatos "built the equipment, . . . scouted the locations, . . .

taught teams how to install equipment, [and] . . . supervised cash-outs."

Limberatos App'x 99. Not only that, but Limberatos's co-conspirator Tita testified

that Limberatos was at the top of the skimming groups with which he worked to

---

[6] Limberatos also argues that the district court failed to explain whether the enhancement applied because there were five or more participants or because the criminal activity was otherwise extensive. But that argument is a non-starter because Limberatos's counsel conceded below that "Limberatos was involved in an extensive operation." Limberatos App'x 99; *see also United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) (explaining that for the enhancement to apply, "the criminal activity at issue must involve five or more participants or be otherwise extensive").

carry out his crimes. That evidence provided a more than sufficient predicate for

the district court to apply the four-level enhancement under Section 3B1.1(a).

### 6. *Acceptance of Responsibility Reduction*

Finally, Limberatos urges that he qualified for the two-level acceptance of

responsibility deduction because he pled guilty to all three conspiracy counts

against him and went to trial on the remaining aggravated identity theft charge

only to raise the legal argument that he did not utilize "means of identification"

to commit his offenses within the meaning of 18 U.S.C. § 1028A. The district court

concluded to the contrary because Limberatos cross-examined witnesses about

the facts at trial and contested the application of almost every sentencing

enhancement based on disputes about the facts underlying his convictions. We

identify no reversible error in the district court's conclusion.

Under Section 3E1.1(a), the defendant's offense level will be reduced by

two levels "[i]f the defendant clearly demonstrates acceptance of responsibility

for his offense." U.S. SENT'G GUIDELINES MANUAL § 3E1.1(a). Although this

"adjustment is not intended to apply to a defendant who puts the government to

its burden of proof at trial by denying the essential factual elements of guilt [and]

is convicted, . . . [c]onviction by trial . . . does not automatically preclude a

defendant from consideration for such a reduction," when "for example . . . a

defendant goes to trial to assert and preserve issues that do not relate to factual

guilt." *Id.* § 3E1.1 app. note 2. "Because the sentencing court is in a unique

position to evaluate a defendant's acceptance of responsibility, its determination

is entitled to great deference on review, and it will not be disturbed unless it is

without foundation." *United States v. Strange*, 65 F.4th 86, 89 (2d Cir. 2023)

(internal citation and quotation marks omitted).

Here, we cannot say that the district court's determination was without

foundation. The district court correctly observed that despite claiming that he

was raising only a legal challenge to the applicability of the aggravated identity

theft statute to his conduct, Limberatos cross-examined witnesses about the facts

of the case at trial and continued to contest at sentencing the basic facts

underlying his criminal conduct – including the extent and nature of his

involvement in the conspiracy to which he pled guilty. In such circumstances, the

district court's decision to decline to apply the two-level reduction for acceptance

of responsibility was a reasonable one.[7]

---

[7] Limberatos also argues that the district court's decision not to apply the
adjustment erroneously relied on application note 2, which provides that the
acceptance of responsibility deduction usually should not be applied to

Accordingly, because Limberatos has failed to establish that the district court procedurally erred in calculating Limberatos's Guidelines range, we affirm his sentence of 120-months' imprisonment.

B.    *Substantive Reasonableness of Constantinescu's Sentence*

Unlike Limberatos, Constantinescu does not challenge the district court's calculation of his Guidelines range of 111 to 132 months' imprisonment. Instead, Constantinescu argues that his below-Guidelines sentence of 92-months' imprisonment is substantively unreasonable because his wife Ionela Constantinescu, who was also a defendant in this case, was sentenced to time served. We disagree.

A sentence is substantively unreasonable only in those rare cases "where the sentence may be procedurally correct but affirming it would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law."

---

defendants who go to trial, because the application note cannot be squared with the text of Section 3E1.1. We, however, do not reach that argument because the district court did not base its decision about the acceptance of responsibility deduction on Limberatos's decision to go to trial but rather on Limberatos's decision to contest the basic facts underlying his criminal conduct at trial and at sentencing.

*United States v. Davis*, 82 F.4th 190, 200 (2d Cir. 2023) (internal quotation marks

omitted). Our substantive review of the district court's sentencing decision

"take[s] into account the totality of the circumstances, giving due deference to the

[district] judge's exercise of discretion, and bearing in mind the institutional

advantages of district courts." *United States v. Wynn*, 108 F.4th 73, 85 (2d Cir.

2024) (internal quotation marks omitted). "While we do not presume that a

Guidelines sentence is necessarily substantively reasonable, that conclusion is

warranted in the overwhelming majority of cases, and thus especially when, as

here, a defendant challenges a *below*-Guidelines sentence." *United States v.

Messina*, 806 F.3d 55, 66 (2d Cir. 2015) (internal citation and quotation marks

omitted).

Here, Constantinescu's sentence is substantively reasonable. To start,

"[t]he law does not require a district court to 'consider or explain sentencing

disparities among codefendants,'" so any disparity between Constantinescu's

sentence and Ionela's sentence does not provide a basis for us to set aside his

sentence as substantively unreasonable. *United States v. Barrett*, 102 F.4th 60, 97

(2d Cir. 2024), quoting *United States v. Alcius*, 952 F.3d 83, 89 (2d Cir. 2020).

Furthermore, the district court was not even in a position to consider whether

there was an unwarranted disparity between Constantinescu's sentence of 92-months' imprisonment and Ionela's sentence of time served because Ionela was sentenced the day *after* Constantinescu by a different district judge.[8]

But even assuming arguendo the district court should and could have taken into consideration Ionela's sentence, Constantinescu's higher sentence appropriately reflects that he is not similarly situated to his wife. While Ionela pled guilty to conspiracy to commit wire fraud and bank fraud, Constantinescu went to trial and was convicted of conspiracy to commit wire fraud and bank fraud, conspiracy to commit access device fraud, conspiracy to commit money laundering, and aggravated identity theft. And nothing in the trial record before the district court suggested that Ionela and Constantinescu had equal roles in the conspiracy, as the evidence of her involvement adduced at trial was almost entirely confined to her cashing out counterfeit debit cards.[9] And Constantinescu's presentence investigation report (the factual findings of which

---

[8] The district court did, however, consider the sentences that had already been given to Constantinescu's other co-defendants in setting Constantinescu's sentence.

[9] The district court also would not have had access to Ionela's presentence investigation report, which may have included additional details about the nature of her involvement with the skimming operation.

the district court adopted without objection from either party) indicated that he physically abused Ionela. Those differences provide a more than adequate justification for the disparity between their sentences. *See Barrett*, 102 F.4th at 97 (finding a sentencing disparity between the defendant and his co-defendants was justified based on a difference in the seriousness of their criminal offenses and that some of his co-defendants pled guilty, while the defendant went to trial); *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (similar); *Alcius*, 952 F.3d at 89 (rejecting a defendant's substantive unreasonableness argument, based on a disparity between the defendant's sentence and her co-defendant's sentence, where the co-defendant pled guilty to one count, "while [the defendant] went to trial and was convicted of five counts").

We accordingly affirm Constantinescu's sentence of 92-months' imprisonment.

## IV.  Constantinescu's Restitution Payment Schedule

Finally, we turn to Constantinescu's challenge to the district court's order obligating Constantinescu to make installment payments toward the $1,953,220.20 he owes in restitution. Specifically, Constantinescu challenges the portion of the order that addresses his payment obligations while incarcerated.

37

As most relevant here, the restitution order required Constantinescu to make

installment payments while incarcerated, but it did not set a payment schedule

for the period of his incarceration. The order, instead, provided that

Constantinescu

> may [make his installment payments] through the
> Bureau of Prisons' (BOP) Inmate Financial
> Responsibility Plan (IFRP). Pursuant to BOP policy, the
> BOP may establish a payment plan by evaluating the
> Defendant's six-month deposit history and subtracting
> an amount determined by the BOP to be used to
> maintain contact with family and friends. The
> remaining balance may be used to determine a
> repayment schedule. BOP staff shall help the Defendant
> develop a financial plan and shall monitor the inmate's
> progress in meeting his restitution obligation.

Constantinescu App'x 48. On appeal, Constantinescu urges that this provision

in the restitution order constitutes an impermissible delegation to the Bureau of

Prisons of the district court's authority to set an installment payment schedule.

Because Constantinescu did not raise this objection to the restitution order

below, we review that order only for plain error. *United States v. Zangari*, 677 F.3d

86, 91 (2d Cir. 2012). To establish plain error, one of the hurdles that

Constantinescu must overcome is showing that the error was plain, meaning that

it was "'clear under current law.'" *United States v. Esteras*, 102 F.4th 98, 108 (2d

Cir. 2024), quoting *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004).

As Constantinescu correctly notes, our cases have established that the district court may not delegate its authority to set restitution installment payment schedules to the Probation Department or Bureau of Prisons. *See United States v. Porter*, 41 F.3d 68, 71 (2d Cir. 1994) (prohibiting the district court from delegating its authority to set a restitution payment schedule to the Probation Department); *United States v. Mortimer*, 94 F.3d 89, 90–91 (2d Cir. 1996) (applying *Porter* to prohibit the district court from delegating its authority to set a restitution payment schedule to the Bureau of Prisons). One of those prior cases, *United States v. Mortimer*, is particularly on point to the present issue before us.

There, the restitution order provided that, "[w]hile in custody, the defendant *shall* participate in the Bureau of Prisons' Inmate Financial Responsibility Program and make restitution in accordance with the policies of that program." 94 F.3d at 90 (emphasis added). We held that this provision impermissibly delegated the district court's authority to set a restitution payment schedule to the Bureau of Prisons because it ordered the defendant to participate in the IFRP, which permits the prison's staff to exercise their discretion to set the inmate's "payment schedule . . . on an ad hoc basis." *Id.* at 90–91. We accordingly

vacated the restitution order and remanded for resentencing. *Id.* at 91.

Constantinescu urges that this case is indistinguishable from *Mortimer*. We are not so sure. On the one hand, unlike the restitution order in *Mortimer* that stated that the defendant "*shall*" make installment payments while incarcerated through the IFRP, 94 F.3d at 90 (emphasis added), the restitution order here provides that Constantinescu "*may*" make installment payments while incarcerated through the IFRP, Constantinescu App'x 48 (emphasis added). At first blush, the permissive language in Constantinescu's order would seem to sufficiently distinguish this case from *Mortimer* such that any error would not be plain.

But, on the other hand, we are not convinced that the restitution order actually leaves Constantinescu the option of not participating in the IFRP. That is so because the district court did not set an alternative payment schedule for the term of Constantinescu's incarceration if he does not participate in the IFRP. As a practical matter then, it is unclear whether Constantinescu would be in compliance with his obligation to make restitution installment payments while incarcerated if, for example, he made payments in an amount that he deemed appropriate, without participating in the IFRP, or if his only effective option for

meeting his restitution obligations is participating in the IFRP. If it is the latter, that brings this case much closer to the restitution provision that we vacated in *Mortimer*.

As the record stands before us on appeal, we are not in a position to definitively resolve how the district court intended the restitution payment schedule to operate while Constantinescu is incarcerated. Instead of opining on the restitution order based on what may be a mistaken understanding of how it operates, we think the wiser course is to vacate the restitution order and remand for the district court to clarify what Constantinescu's payment obligations while incarcerated are if he does not participate in the IFRP. We accordingly vacate the restitution order and remand for the district court to clarify the installment payment schedule.[10]

## CONCLUSION

We have considered Defendants' remaining arguments and find them to be without merit. We accordingly vacate Constantinescu's restitution order and

---

[10] Although Limberatos's restitution order is structured in the same potentially problematic manner as Constantinescu's order, Limberatos did not challenge his restitution order on appeal. Accordingly, he has abandoned any objection to that order.

remand for clarification but otherwise affirm Defendants' convictions and

sentences in full.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

42